566 P.2d 107

Bessie CASAUS, Plaintiff-Appellant,

v.

LEVI STRAUSS & CO., Employer, and Insurance Company of North America, Insurer, Defendants-Appellees.

No. 2767.

Court of Appeals of New Mexico.

June 7, 1977.

Writ of Certiorari Denied June 30, 1977.

. John Hogan Stewart, P. A. and Leof T. Strand, Albuquerque, for plaintiff-appellant.

Bryan L. Query, Steve Williams, Shaffer, Butt, Jones, Thornton & Dines, P. C. Albuquerque, for defendants-appellees.

## OPINION

SUTIN, Judge.

Plaintiff appeals a workmen's compensation judgment that awarded her compensation for total temporary disability for a period of 19 months ending November 1, 1975, but did not award her any compensation for any disability thereafter. We reverse.

A. *Plaintiff was entitled to 25% partial disability after November 1, 1975.*

The trial court found that plaintiff was totally disabled from June 4, 1974, until November 1, 1975; that plaintiff did not have any disability subsequent to November 1, 1975, which would prevent her from returning to work for her employer or for some other employer.

The test is whether plaintiff, after November 1, 1975, was partially unable to

perform any work for which she was fitted. Section 59–10–12.9, N.M.S.A.1953 (2d Repl. Vol. 9, pt. 1); *Medina v. Zia Company,* 88 N.M. 615, 544 P.2d 1180 (Ct.App.1975).

Plaintiff worked as an inspector for 15 days. This work involved standing for eight hours, picking up pants, bending and pushing. She suffered an accidental injury on March 25, 1974. She had a high school education and had worked as an egg candler, office clerk or assistant bookkeeper and a live-in housekeeper. As an egg candler she had to stand and lift egg cartons, containing 40 dozen eggs, for eight hours a day. As an office clerk or assistant bookkeeper, she had to sit for eight hours a day. As a live-in housekeeper, she did all of the cooking and cleaning for a widower and his three children which involved bending, standing and lifting.

On August 28, 1974, a surgeon removed a coccygeal joint, the end of the vertical column beyond the sacrum, the last bone on the spine. It is referred to as the "tailbone." On November 25, 1975, subsequent to termination of her total temporary disability, she suddenly got worse with pain in the coccygeal-rectal area, and medication was renewed. The last time the surgeon saw her was February 9, 1976. At that time she complained that "her neck was very tight and tense for three or four days, and that she was somewhat dizzy." She could not stand or sit for more than a few hours without changing her position, and she could not return to work where she had to stand all day long.

The surgeon stated that in his opinion, based upon reasonable medical probability, the accident she suffered during her employment was the cause of her impairment of function and disability at the time of trial on April 15, 1976. It was his opinion that she was unable to work in employment that required standing or sitting all day long; she would probably be able to work if she could change positions, part-time standing, part-time sitting, frequently changing her position every few hours. She was still suffering pain.

In the surgeon's opinion, plaintiff was totally disabled until November, 1975. From that date forward she had 15% partial impairment of function to the lower body and 25% partial disability. Plaintiff has not worked from March 25, 1974. There was substantial evidence to support the surgeon's opinion.

Unfortunately, the trial court did not state any reason why the surgeon's testimony on partial disability was disregarded. It is impossible to guess what the judge did experience in trying this case and what his reactions were to the evidence. It appears that the trial court's beliefs were based on an emotional observation of subjective factors, and not objective data. Appellate courts are often similarly affected by desires and aims that push and pull them without regard to the objective situation.

Defendant relies on the testimony of three doctors who examined plaintiff in 1974. One doctor examined her on April 8, 1974. A second doctor examined her on May 31, 1974, and the third doctor last examined her on June 28, 1974. From their testimony, the court could have found that she did not suffer a work related injury. Defendant, however, did not cross appeal on this issue. The trial court chose not to accept this testimony. It chose the testimony of plaintiff's surgeon. We cannot see how the testimony of defendants' doctors can serve as a foundation for a decision that the plaintiff was not disabled. Not one of the doctors had seen plaintiff in the 17 months preceding November 1, 1975.

■ "In the instant case, where causal connection has been denied and must be established by medical testimony as a medical probability, and where medical opinion based on the facts has been expressed and is uncontradicted, the evidence is conclusive upon the court as trier of the facts." *Ross v. Sayers Well Servicing Company,* 76 N.M. 321, 326, 414 P.2d 679, 683 (1966); *Lyon v. Catron County Commissioners,* 81 N.M. 120, 464 P.2d 410 (Ct.App.1969). This means that the uncontradicted evidence is conclusive as to the establishment, as a medical probability, of *the causal connection* between the accident and the disability as

expressly required by § 59–10–13.3, N.M.S.A.1953 (2d Repl. Vol. 9, pt. 1). *Lucero v. Los Alamos Constructors, Inc.,* 79 N.M. 789, 450 P.2d 198 (Ct.App.1969). The causal connection was established in the instant case.

■ Opinion testimony of a medical expert can also be considered as substantial evidence upon which a finding of total or partial disability can be made. *Roybal v. County of Santa Fe,* 79 N.M. 99, 440 P.2d 291 (1968). However, a percentage opinion may be disregarded by the trial court if there is other competent evidence to the contrary. This is of necessity true when more than one medical expert testifies. *Lucero,* supra; *Seal v. Blackburn Tank Truck Service,* 64 N.M. 282, 327 P.2d 797 (1958). Neither is the medical opinion conclusive if there is lay opinion testimony to the contrary on the determination of a fact in issue. *State v. Lujan,* 87 N.M. 400, 534 P.2d 1112 (1975); *State v. Smith,* 80 N.M. 126, 452 P.2d 195 (Ct.App.1969); see Rule 701 of the Rules of Evidence [§ 20–4–701, N.M.S.A.1953 (Repl. Vol. 4, 1975 Supp.)].

■ We can find neither expert nor non-expert testimony in the record to conflict with the percentage opinion of plaintiff's surgeon on partial disability. The percentage opinion stands uncontradicted as competent evidence. It cannot be disregarded by the trial court. We have a well established rule that where facts are not in dispute and but one reasonable inference can be drawn therefrom, this Court can independently draw its own conclusion and overrule contrary conclusions of the trial court. *Lyon v. Catron County Commissioners,* supra. We do so in this case.

The plaintiff is entitled to 25% partial disability compensation payments from November 1, 1975, as provided by law.

B. *Plaintiff was entitled to payment of minor medical expense.*

■ The trial court excluded plaintiff's offered exhibits 7 and 8 in the sum of $72.68. These were charges of the New Mexico Medical Foundation and Bernalillo County Medical Center incurred by plaintiff on March 25, 1974, when plaintiff went to the emergency room of the Medical Center. The reasonableness of the bills was not questioned.

Plaintiff's surgeon testified that these charges were "necessary, usual and customary." The trial court requested authority for admission of this evidence. Later, after authorities were presented, the trial court denied admission of the exhibits because "The doctor said that he didn't even know." We cannot find such testimony on the part of plaintiff's doctor.

For the benefit of court and counsel generally, we emphasize Rules of Evidence 702, 703, and 704 [§§ 20–7–702, 703, 704, N.M.S.A.1953 (Repl. Vol. 4, 1975 Supp.)]. These rules pertain to expert testimony, basis of opinion testimony and opinion on ultimate issue. These rules should convince a trial court that testimony such as that of Dr. Altman is sufficient to warrant the admission of the evidence in this case.

Medical bills are admissible in evidence when it is "shown that the services for which the bills were rendered were reasonably necessary as a result of plaintiff's accident." *Williams v. City of Gallup,* 77 N.M. 286, 293, 421 P.2d 804, 809 (1966).

In *Williams,* the *treating doctor* did not testify that a medical center bill and the bill of a doctor on its staff were reasonably necessary as a result of the accident. We do not know whether this rule applies to a *non-treating* doctor who first examines the patient several months later. We believe the same rule should apply to the *non-treating doctor.*

A non-treating doctor is a medical expert. His knowledge of the facts which led a patient from an accidental injury into a hospital is sufficient upon which to render an opinion that the services rendered were reasonably necessary. In fact, under Rule 705 of the Rules of Evidence, "[t]he expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on

cross-examination." Section 20–4–705, N.M.S.A.1953 (Repl. Vol. 4, 1975 Supp.). Even when the plaintiff is available as a witness, "[s]tatements made for purposes of medical diagnosis or treatment" are admissible as an exception to the hearsay rule. Section 20–4–803(4), N.M.S.A.1953 (Repl. Vol. 4, 1975 Supp.).

The surgeon's opinion that the bills were "necessary, usual and customary" was sufficient to allow the exhibits in evidence.

Plaintiff is entitled to payment of $72.68.

C. *Attorney fee granted plaintiff in trial court was not an abuse of discretion.*

The trial court awarded plaintiff an attorney fee of $800.00, plus a tax of $34.00. Plaintiff contends this was not a reasonable attorney fee. "It is recognized that the fixing of attorney fees in compensation cases is a matter resting in the sound discretion of the trial court." *Waymire v. Signal Oil Field Service, Inc.,* 77 N.M. 297, 302, 422 P.2d 34, 38 (1966). Some eleven years ago the Supreme Court in *Waymire* believed that a fee of $1,000.00 was an abuse of discretion and raised the fee to $1,500.00. Although not stated by the Supreme Court, it had to believe that the trial court, all the circumstances before it being considered, exceeded the bounds of reason. *Independent, Etc. Co. v. N. M. C. R. Co.,* 25 N.M. 160, 178 P. 842 (1918).

Plaintiff requested an attorney fee of $2,000.00. The defendant requested an attorney fee of $800.00, plus tax, for plaintiff. The trial court adopted the request of defendant.

Section 59–10–13.10(A), N.M.S.A.1953 (2d Repl. Vol. 9, pt. 1) provides:

When a workmen's compensation claim is at issue, *the judge of the district court shall advance the cause on the court's calendar and dispose of the case as promptly as possible.* The trial shall be conducted in a summary manner as far as possible. [Emphasis added.]

This statute is mandatory. Section 1–2–2(I), N.M.S.A.1953 (Repl. Vol. 1). Fifty-

three years ago in *Gonzales v. Chino Copper Co.,* 29 N.M. 228, 232, 222 P. 903, 905 (1924), Justice Bratton wrote:

It may well be kept in mind that the theory upon which the Workmen's Compensation Acts of the several states were adopted was to substitute a more humanitarian and economical system of compensation for injured workmen or their dependents in case of their death; *to provide a speedy and inexpensive method by which such compensation might be made to such employees or those dependent upon them and which is more in harmony with modern methods of industry than the common-law liability for torts, which usually involved long, tedious and expensive litigation * * *.* [Emphasis added.]

In *Codling v. Aztec Well Servicing Co.,* 89 N.M. 213, 549 P.2d 628, 630 (Ct.App.1976), we said:

Within the policy considerations of the Workmen's Compensation Act the interests of the claimant and the public are paramount. To prevent the claimant from being on the welfare rolls is a part of the legislative scheme.

The policy of the law is for a speedy trial of the issues of liability and to this end claims for compensation should be advanced on the docket for trial. Long delays in the final decisions of the case result in injurious consequences to the injured employee. *Stovall v. General Shoe Corporation,* 204 Tenn. 358, 321 S.W.2d 559 (1959).

We believe that the statute and the purposes for which it was adopted are not only applicable to the district judge but apply equally to officers of the court who have a solemn duty to assist in a speedy trial. We compliment the court and reproach plaintiff's attorney who caused this delay, as shown by the record.

In the instant case, plaintiff's complaint was filed August 12, 1974. Defendants' answer was filed September 5, 1974. After motion of defendants for an order to take depositions, the parties were noticed to trial on the court's calendar on workmen's

compensation cases for January 23, 1975. The plaintiff subpoenaed her surgeon as a witness for trial. Defendants gave notice of depositions of plaintiff's surgeon and plaintiff on January 13, 1975, and January 17, 1975. The plaintiff and defendants moved the court to vacate the trial setting because discovery was incomplete; that it would require 45 days. The trial court vacated the hearing for 45 days. On January 20, 1975, plaintiff gave notice that the cause had been reset for hearing on the merits on March 24, 1975. On March 17, 1975, plaintiff moved the court to vacate the March 24 setting because her attorney was undergoing extensive dental work and was unable to prepare for trial. The trial court vacated the March 24 setting. On December 17, 1975, nine months later, *another attorney* appeared for plaintiff and requested a trial setting. The court set the request for hearing on February 19, 1976. On January 9, 1976, plaintiff gave notice of hearing on the merits on February 25, 1976. On February 12, 1976, the parties requested the court to vacate the setting of February 25th for reasons stated. The trial court vacated the setting. On February 12, 1976, plaintiff requested a hearing on the merits, and the court set the hearing for April 15, 1976. Depositions were taken during March and April, 1976, before the trial. Trial was had on April 15, 1976. Judgment was entered September 23, 1976. Two years and one month passed from the time of filing the complaint to the date of judgment.

The trial judge is complimented on his devotion to the advancement of the cause on his calendar as required by statute. The unconscionable delay in the trial of this case must be placed on the first attorney for plaintiff who caused the delay. Plaintiff cannot complain of the award of $800.00 as attorney fees. The trial court, under the circumstances of this case, did not abuse its discretion in the amount awarded as attorney fees.

D. *Defendants' motion to dismiss appeal is denied.*

Defendants moved this Court to dismiss plaintiff's appeal because plaintiff failed to file the transcript of record within the time allowed. Defendants overlooked an order of the trial court extending the time for filing the transcript on appeal. The transcript was filed in time. The motion to dismiss is denied.

This cause is reversed and remanded to the district court; that an amended judgment be entered below to include the following:

(1) It is further ordered, adjudged and decreed that from and after November 1, 1975, plaintiff recover judgment against defendants the sum of $_____ per week [the amount to be computed and entered] for partial disability to the extent of 25%, together with all medical and hospital expenses thereafter incurred as a result of the compensable injury, until the further order of this Court.

(2) That the sum to be recovered for medical expenses be increased by $72.68 for a total of $2,138.18.

The plaintiff is entitled to attorney fees for services on this appeal in the sum of $1,750.00.

IT IS SO ORDERED.

LOPEZ, J., concurs.

HERNANDEZ, J., dissenting in part, concurring in part.

HERNANDEZ, Judge (dissenting in part, concurring in part).

I respectfully dissent from parts "A" and "B" of the majority opinion and concur with part "C".

The majority in their discussion in part "A" state: "In the surgeon's [Dr. Altman] opinion, plaintiff was totally disabled until November, 1975. From that date forward she had 15% partial impairment of function to the lower body and 25% partial disability. Plaintiff has not worked from March 25, 1974. There was substantial evidence to support the surgeon's opinion." They go on to state: "We can find neither expert nor non-expert testimony in the record to conflict with the percentage opinion of plain-

tiff's surgeon on partial disability. The percentage opinion stands uncontradicted as competent evidence. It cannot be disregarded by the trial court."

It is my opinion that the majority misconceive the issue to be decided. The issue, as I see it, is whether there is substantial evidence to support the following findings made by the trial court:

"That plaintiff did not have any disability subsequent to November 1, 1975, as a result of said accident, which would prevent her from returning to work at Levi Strauss & Co. in work for which she was qualified and could perform, whether at Levi Strauss & Co. or for some other employer."

"That plaintiff was not wholly or partially unable after November 1, 1975 to perform any work for which she was at that time fitted or qualified."

The following, in my opinion, is substantial evidence in support of these findings: Dr. Sidney Schultz, an orthopedic surgeon, who first examined plaintiff about one month after her injury, testified in part as follows:

"She showed some limitation of low back motion, questionable muscle spasm and no signs of any nerve root pressure in her low back. * * * this lady's manifestation throughout the examination, I felt, were exaggerated * * * she complained of soreness or pressure, regardless of where she was touched. * * *"

Dr. Schultz sent plaintiff to Dr. Seelinger for an electromyogram test which was performed on May 1, 1974. As to the results of that test, Dr. Schultz testified:

"I believe that nervousness is her major problem, all the tests were normal * * *. As of the 15th [May], pain localized to coccyx now; nothing else hurts. * * * pain in the tailbone is a very common neurotic complaint in females. * * * I saw her on June 28th, and she was still complaining bitterly of pain in the tailbone * * *. I cannot find anything to account for this woman's complaints, clinically. I X-rayed her sacrum and coccyx and the X-rays were normal * * *."

Dr. Schultz reading from a letter dated August 27, 1974, which he had written as to whether plaintiff could return to work stated the following:

"* * * when she was last seen on June 28, 1974, she still complained bitterly of pain in the tailbone. I can find no orthopedic reason for her persistent complaints. She was worked up by Dr. Sager * * * and he could find no pathology that could account for her complaints * * * since I have not seen this woman for the past two months, I am unaware of her present condition, however, from a strict orthopedic standpoint, I can see no reason why she would not be able to return to work."

Dr. Edward M. Sager, a family physician, who first examined plaintiff on March 29, 1974, testified in part as follows:

"* * * she exhibited some tenderness in her mid lumbar area and the lower area of her back * * *."

Plaintiff was admitted to the hospital on April 1, 1974, and discharged on April 12, 1974. Dr. Sager referring to his discharge summary testified that:

"She was treated with bed rest, traction, an analgesic, physical therapy, lumbar sacral X-rays were noted as negative * * patient's physical findings initially were somewhat bizarre, neurologically * * the day that I admitted her to the hospital, she was complaining of pain and exerting (sic) symptomatology entirely on the right, now, at this point it is also involving the left, and yet on the third [of May], my note indicates that she has improved, it was at this time that I elected to have her seen and evaluated by Dr. Peter Stern."

Dr. Sager when asked "When you first saw Miss Casaus, Doctor, did she complain of any pain in her tailbone or coccyx area?" answered no. Dr. Sager saw plaintiff again on May 31, 1974, after she had been evaluated by Dr. Schultz. As to this visit, Dr. Sager testified: ". . . she states that she is feeling pressure on the coccyx . . . .."

Dr. Sager when asked: "Assuming that Miss Casaus sustained an injury so severe, as a result of this accident, that it required a coccygectomy. What is your opinion as to whether it is unusual for a person to first complain of pain in the coccyx two months after an injury of this type?" Dr. Sager answered: "I would say that this would be extremely remote, it would be impossible." As to the results of a pelvic-rectal examination that Dr. Sager made of plaintiff he testified:

"* * * I doubt that coccygodynia exists, which is a pathological problem with the coccyx, but, the patient states that she has rectal fullness and pain. There was a rectal examination which physically and essentially is within normal limits * * *."

Dr. Sager when asked: "What is your opinion as to the frequency of a wobbly coccyx or a coccyx which requires that it be removed related to a lifting type injury?" Answered: "They really don't relate, because in lifting, you are using the muscles, the low back and thoracic, upper back, the coccyx is really a rudimentary left over tail type structure, it just sits there and, unless you fall and land on it, it would be rather an uncommon injury and even at that, it would take a fall on an elevated or blunt type object, because it is rather well-cushioned because of the gluteal area, the behind."

Dr. Peter D. Stern, an orthopedic surgeon, who examined plaintiff on April 8, 1974, testified as follows from his notes prepared at that time:

"This 36-year old patient states that she has a severely injured back. She states that she has pain radiating to both her lower extremities, but she has more pain in the right lower extremity. * * * On examination there are multiple inconsistencies * * * which is to say that none of the tests were consistent with the other tests that were done to confirm the presence or absence of sciatic nerve injury or low back injury. * * * Based on the inconsistencies and the psychiatric stretch tests [and other tests] * * * I concluded that this patient was either malingering about her low back problem or pain, or had emotional problems with relation to this injury, and I could find little anatomic basis to substantiate her claims of low back pain with radiation into the lower extremities."

The plaintiff did not complain of any pain in the coccyx area to Dr. Stern. When asked, in his experience, "What percentage of coccyx injuries occur with a lifting type of injury?" Dr. Stern answered, "Very few. The vast majority are from a direct fall on the tailbone such as when a prankster pulls out a chair and a person sits on the floor. This is the vast majority, if not all of the cases that I have seen involving tailbone injury."

Dr. Stern when asked: "Assuming that in June, 1974, Bessie Casaus no longer complained of any back pain to her treating physician, Dr. Sidney Schultz, and based upon the fact that during your examination on April 8, 1974, her complaints were solely attributable to the back; do you have an opinion as to whether she, in June of 1974, had any type of physical or functional impairment?" Answered: "If she had no complaints referable to her low back, and no other complaints, I would suppose that she would be able to return to work."

Granted that neither Dr. Schultz, Dr. Sager or Dr. Stern uttered the specific words "the plaintiff has no disability arising out of the incident in question." However, in my opinion, the import of their testimony is unmistakable: the plaintiff has no disability partial or otherwise. It is readily apparent that the plaintiff is a hypochondriac.

As to part "B" the trial court in my opinion properly denied the admission of exhibits 7 and 8 into evidence. Dr. Altman had no personal knowledge of the matter and a proper foundation for a hypothetical question was not established.